Filed 11/7/22  P. v. Taylor CA5
Opinion following transfer from Supreme Court

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TRAMEL VERNON TAYLOR,<br><br>Defendant and Appellant. | F082567<br><br>(Super. Ct. No. SC082158A)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Kern County.  Michael G. Bush, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

---

[*]     Before Levy, Acting P. J., Detjen, J. and Smith, J.

In 2001, a jury convicted petitioner Tramell Vernon Taylor of first degree murder (Pen. Code, § 187, subd. (a), count 2).[1]  As to the murder offense, the jury found true the special circumstance that petitioner committed the murder while engaged in the commission or attempted commission of robbery (§ 190.2, subd. (a)(17)(A)).[2]  The trial court subsequently sentenced petitioner to a term of life without the possibility of parole. (*People v. Taylor et al.* (Oct. 14, 2003, F039096) [nonpub. opn.] (*Taylor*).)

In 2019, petitioner filed a petition for resentencing on his murder conviction pursuant to former section 1170.95 (now § 1172.6).[3]  The trial court summarily denied the petition without providing a statement of reasons.

On appeal, petitioner contended the jury's special circumstance finding could not establish his ineligibility for resentencing as a matter of law because his conviction predated our Supreme Court's decisions in *Banks*/*Clark*,[4] which clarified the meaning of "major participant" and "reckless indifference to human life."[5]  We affirmed the trial court's denial of resentencing.  (*People v. Taylor* (June 10, 2022, F082567 [nonpub. opn.].)

---

[1]     All further statutory references are to the Penal Code, unless otherwise specified.

[2]     Petitioner was convicted of additional offenses and enhancements, as described below.

[3]     Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6, with no change in text.  (Stats. 2022, ch. 58, § 10.)  We will refer to the current section 1172.6 in this opinion.

[4]     *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*); *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

[5]     Petitioner also contended the trial court erred in engaging in premature factfinding, erred in applying a "sufficiency of the evidence" test at the prima facie stage, and violated his procedural due process rights by denying the petition without issuing an order to show cause.  Because we conclude petitioner established a prima facie case for relief under section 1172.6, we do not address these arguments in this opinion.

Petitioner petitioned the California Supreme Court for review (S275471). The state high court granted review and ultimately transferred the matter to us with directions to vacate our opinion and reconsider the matter in light of *People v. Strong* (2022) 13 Cal.5th 698 (*Strong*). In *Strong*, our Supreme Court held that a pre-*Banks*/*Clark* special circumstance finding does not render a section 1172.6 petitioner ineligible for relief as a matter of law. We therefore vacate our opinion, reconsider the matter in light of *Strong*, vacate the trial court's order, and remand the matter for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

We include a brief summary of the facts of this case taken from petitioner's direct appeal.[6]

> "Murder victim Darryl McCoy, Jr. (DJ) [fn. omitted] 'hung out' with defendant Richardson and knew [petitioner]. McCoy's mother, Shawna G[.],[7] used crack cocaine. From October to December of 2000 she sometimes purchased her drugs from Kendall M[.] (Pookie) at [a] [m]otel. [Shawna] also had a relationship with Calvin M[.] (Aces), a friend of [Kendall].

> "On the evening of December 5, 2000, Aaron G[.] (McCoy's uncle and Shawna's brother) was staying with Shawna in her home. McCoy, [petitioner] and Richardson arrived at Shawna's home at approximately 10 or 11 p.m. on the evening of December 5, 2000. On this night, Shawna heard McCoy talk with Richardson about robbing [Kendall] in his room at the [motel]. Richardson suggested that McCoy ask Shawna if [Kendall] and his friends had guns and/or money. Shawna told McCoy not to ask her anything.

> "McCoy, [petitioner] and Richardson conversed that evening with Aaron. They asked him what was happening on 'U Block' (Union Street) and inquired if there was any 'money rollin' through there.' Aaron told the

---

**6** We provide these facts from the direct appeal because they were cited by both parties in their opening briefs. However, we do not rely on these facts in resolving the issues presented in this appeal. (See § 1172.6, subd. (d)(3).)

**7** Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended.

3.

three 'nobody got it going on down there.' [Petitioner] disagreed with Aaron's assessment of the situation and insisted that [Kendall] and others had a lot of money. [Petitioner] continued to encourage the group to go to the [motel] to rob [Kendall] and others. Aaron insisted that the occupants of the motel did not have any money. McCoy, Richardson and [petitioner] agreed to a plan to go to the motel and rob [Kendall] and others. Aaron testified that Richardson always carried a gun with him and that [petitioner] was carrying a small gun with a clip the night of the murder. [Fn. omitted.]

"McCoy, [petitioner] and Richardson left in a dark-colored Ford Blazer. [Petitioner] was driving.

"In December of 2000, [Kendall] had been living in room 4 of the … motel for two or three months. His sister Crystal lived in room 3 with their mother, Darlene L[.] Crystal's boyfriend was Brian C[.] (Rifle). Bobby S[.] (G Bob) lived in room 12.

"On the evening of December 5, 2000, [Kendall], Tyrone J[.] (Rone), and Shavon S[.] (V) were in room 4 drinking, smoking marijuana, and watching television. [Brian] was in and out of room 4 that evening.

"G Bob saw McCoy outside of G Bob's room before 1 a.m. on December 6, 2000. He was with two other individuals that G Bob did not know. McCoy was wearing a light-colored sweatshirt. The three individuals came into his room. G Bob asked McCoy if he would sell him some crack cocaine. McCoy said he was not there to sell crack. G Bob asked McCoy if he wanted to pay for a prostitute. McCoy replied no. The group was in his room for three to five minutes and then G Bob asked them to leave. G Bob left also.

"G Bob testified that he had seen a gun lying on a table in room 4 on more than one occasion. He was in room 4 hours before the shooting and he saw the gun in the room on a table. At trial, G Bob said he did not see [petitioner], Richardson, or McCoy with a gun. When G Bob was interviewed soon after the shooting, he told Detective Adair that one of the three men pulled out a gun as the men walked toward room 4. G Bob identified Richardson as the individual with the gun. At trial, he testified that he never saw anyone pull out a gun.

"At the time when McCoy was visiting with G Bob, Calvin [] (Ace) arrived at the … [m]otel to pick up [Kendall]. He noticed three or four men wearing dark clothing by room 12. He got 'bad vibes' from them and thought they looked like they were getting 'geared up' for something. [Calvin] knocked on the door of room 4. [Kendall] answered the door, and

4.

[Calvin] told him to grab his stuff so they could get out of there because there were men nearby who looked suspicious. [Calvin] headed towards his car to wait for [Kendall]. [Kendall] shut the door and stayed in the room to gather up some of his things. Someone called the room and told [Kendall] that some suspicious men in the parking lot were going to do something.

"McDaniel opened the door and saw 'the silver guns' and then he saw 'gun flashes.' McDaniel tried to close the door. He ran to the bathroom. He heard 12 or 13 more shots and then left through the bathroom window. McDaniel told officers that the person who shot him wore a ski mask or a hood.

"V testified that 10 minutes after someone came to their door and warned them that there were suspicious people outside, someone came in the room shooting. V was on the bed half asleep when the shooting started; he fell to the side of the bed. One person came into the room shooting and another person started shooting from outside of the room. After a few minutes the shooting stopped and V went out the bathroom window.

"When interviewed by Detective Adair, V stated that after they had been warned that something was going to occur he looked out of the room. He saw G Bob and three others approach the room. G Bob continued walking away from the room but the other three stopped. Two of the males were wearing dark clothing and a third was wearing light-colored clothing. He said that one in dark clothing entered the room shooting and another in dark clothing stayed in the area of the open door and was shooting into the room. He did not see the person in the light-colored clothing in the room or shooting.

"James testified that he was asleep before the shooting. He dropped to the floor and stayed there until the shooting stopped. He then left out the bathroom window. Because he was on the floor he did not see anything.

"McDaniel, V, and James all testified that they did not have a gun in the room and they were not selling drugs from the room. They denied being members of the Country Boy Crips.

"[Brian] testified that he was in room 3 with McDaniel's sister when he heard gunshots. He did not look out the window and did not see anyone. He got down on the floor beside the bed and eventually jumped out the bathroom window. When interviewed after the shooting, [Brian] said he heard gunfire and looked out the window. He said he saw someone outside his window in room 3 wearing a light-colored sweatshirt, leaning forward

5.

and twisting and shooting a handgun into room 4. It looked like this person got shot and fell to the ground.

"Warren M[.] was living at the … motel in room 15. He heard shots in the early morning hours of December 6, 2000. He called 911 but did not look out his window. When he did look out his window, he saw two people picking up a body and putting it into a dark-colored sports utility vehicle.

"Police officers arrived at the … motel. McDaniel had been shot. He was transported to the hospital. McDaniel had a gunshot wound to his upper abdomen. The entry wound was underneath the ribs; the bullet was lodged in the back of his body, just behind his armpit. McDaniel also had a penetrating gunshot wound in his right upper arm and left forearm. Bullets were not recovered from these wounds.

"Police officer Bobby Ray Woolard arrived at the … [m]otel. He secured room 4 and then waited outside. He heard a noise inside the room. He reentered the room and found V and James had entered the room from the bathroom window. They were placed into handcuffs and seated in patrol cars.

"The police radios were on in the car. Information came over the radio indicating that [petitioner] may have been involved in the incident. V said, '[petitioner] definitely shot Pookie.' Officer Woolard saw what looked like drugs in front of room 4.

"On December 6, 2000, Raynisha F[.], the mother of [petitioner]'s child, was at the home of her mother, Latonia W[.] Her sister Kandis N[.] was at the home also. [Kandis] heard a car coming quickly up the street. She heard the car brake and the car doors open. The front door to the house opened and [petitioner] ran inside. He said his friend had been shot. [Latonia] called 911. [Kandis] called an ambulance and went outside, as did [Raynisha] and [Latonia]. [Petitioner] and Richardson took McCoy out of the Blazer and put him on the grass. [Kandis] took McCoy's shirt off and tried to stop the bleeding. [Petitioner] was standing over [Kandis]; shortly thereafter [petitioner] departed.

"Police arrived at [Latonia]'s home. An officer asked Richardson for his driver's license. He complied. The officer inquired who had been driving the Blazer. Richardson said [petitioner]. The officer asked Richardson for the room number of where this incident took place. Richardson commented they were just visiting friends. The officer told Richardson he knew this incident happened at the [motel] and asked him for the number of the room where the incident occurred. Richardson

6.

admitted the incident happened near room 4. The officer went inside looking for [petitioner] but could not find him. When the officer returned outside, Richardson was no longer at the scene.

"McCoy was transported to the hospital. He died from a single gunshot wound through his heart. The path of the bullet was sharply downward and front to back. It was the pathologist's opinion that McCoy was crouched or in a stooped position when he was shot. McCoy would have been incapacitated in a matter of seconds after being shot. A bullet was retrieved from McCoy's body.

"Officer Jeff Cecil seized items from the lawn on Fifth Street. Included in the items were a white tee shirt and a gray fitted sweatshirt. These items had blood on them. There were no bullets or guns in the Blazer on Fifth Street.

"A bullet was retrieved from McDaniel during surgery. Numerous nine-millimeter Markahov casings were found in room 4. An expert determined that the bullet from McDaniel and the casings found scattered about in room 4 were fired from the same weapon. Two .38-caliber spent bullets were found in room 4. The bullet recovered from the deceased victim, McCoy, was either a .38-caliber or a nine-millimeter. Based on markings on the bullets and casings, the expert determined that the bullet from McCoy's body could not have been fired from the same gun that fired the bullet retrieved from McDaniel or the .38-caliber spent bullets found in room 4. At least three guns were fired during the shooting. In addition, two live .45-caliber shells were located in the parking lot, suggesting the presence of a fourth gun. Also, there were numerous holes in the walls and windows of room 4. Because of the location of the holes, the police did not attempt to recover spent bullets from these areas.

"Frank Gonzales, a police officer in the gang suppression unit, testified that [Brian], V, and James were active members in the Country Boy Crips. McDaniel was not a full-fledged Country Boy Crip but was an affiliate. [Petitioner], Richardson, and McCoy were members of the West Side Crips. The West Side Crips and the Country Boy Crips were deadly rivals. It was his opinion that the crimes that occurred on December 6, 2000, were gang related and performed with the intent of benefiting the gang.

**Defense**

"Witnesses testified regarding the whereabouts of [petitioner] and Richardson on December 5, 2000. [Fn. omitted.] Richardson testified on

7.

his own behalf. He claimed his group went to the motel because McCoy wanted to visit G Bob. As they were leaving, shots rang out from room 4. Richardson and [petitioner] picked up McCoy, put him in the Blazer, and drove to Fifth Street. Richardson was so shaken up by the incident that he left after giving the police officer his identification. He claimed that he did not have a gun, nor did [petitioner] or McCoy. A private investigator testified that it was his opinion that Richardson was not a gang member." (*Taylor*, *supra*, F039096.)

On March 12, 2001, the Kern County District Attorney filed an information charging petitioner with the first degree murder of McCoy (§ 187, subd. (a), count 2) with the special circumstance that the murder was committed during the commission or attempted commission of robbery (§ 190.2, subd. (a)(17)(A)) and conspiracy to commit both robbery and murder (§§ 182, subd. (a)(1), 212.5, subd. (c), 187, subd. (a), count 1) with specific overt acts,[8] along with a gang enhancement (§ 186.22, subd. (b)(1)), out of custody enhancement (§ 12022.1), and a firearm enhancement (§ 12022.53, subd. (d)). As to a prior November 26, 2000 incident, the information also alleged the offenses of robbery (§ 212.5, subd. (c), count 3 (Herman J.)), with a gang enhancement (§ 186.22, subd. (b)(1)) and a firearm enhancement (§ 12022.53, subd. (d)); robbery (§ 212.5, subd. (c), count 4 (Pamela W.)), with a gang enhancement (§ 186.22, subd. (b)(1)) and two firearm enhancements (§ 12022.53, subds. (b), (d)); assault with a firearm (§ 245,

---

[8]     The overt acts alleged in the information were as follows: (1) on December 5, 2000, West Side Crip coconspirators petitioner and Richardson went to the motel to locate rival Country Boy Crip gang members; (2) West Side Crip coconspirators petitioner, Richardson, and McCoy went back to the motel on December 6, 2000 to attack the occupants of room number 4; (3) the three West Side Crip coconspirators obtained masks to use in the attack; (4) one of the coconspirators said "what's up cuzz" to Brian C. before the attack; (5) when the door to room number 4 opened, one of the West Side Crip coconspirators shot McDaniel; (6) one of the West Side Crip coconspirators went into the room and shot several times at the occupants; (7) petitioner and Richardson gathered up their fallen West Side Crip coconspirator and loaded him into a S-10 Blazer; (8) petitioner and Richardson dumped their fallen West Side Crip coconspirator in the front yard of a house in West Side Crip territory; (9) petitioner fled from the house at about the time officers were arriving; and (10) West Side Crip coconspirator Richardson fled after talking to officer Dickson.

8.

subd. (a)(2), count 5 (Sabrina B.)), with a gang enhancement (§ 186.22, subd. (b)(1)) and a firearm enhancement (§ 12022.5, subd. (a)(1)); assault with a firearm (§ 245, subd. (a)(2), count 6 (Herman J.)), with a gang enhancement (§ 186.22, subd. (b)(1)), a firearm enhancement (§ 12022.5, subd. (a)(1)) and a great bodily injury enhancement (§ 12022.7).[9]

On June 27, 2001, a jury convicted petitioner of first degree murder (§ 187, subd. (a), count 2) and found true the robbery special circumstance (§ 190.2, subd. (a)(17)(A)). The jury also convicted petitioner of conspiracy to commit robbery and murder (§§ 182, subd. (a)(1), 212.5, subd. (c), 187, subd. (a), count 1) and found true overt acts 3, 5, 6, 7, 8, 9, and 10, along with finding true the gang (§ 186.22, subd. (b)(1)) and firearm (§ 12022.53, subd. (d)) enhancements.[10] On September 25, 2001, as to count 2, the trial court sentenced petitioner to a term of life without the possibility of parole. As to count 1, the trial court sentenced petitioner to the upper term of five years, plus an additional five years for the gang enhancement (§ 186.22, subd. (b)(1)) and an additional two years for the out of custody enhancement (§ 12022.1) to run concurrent with count 2.[11]

On appeal, this court ordered the abstract of judgment corrected to delete the imposition of the $200 restitution fine imposed pursuant to section 1202.45, but in all other respects affirmed the judgment. (*Taylor*, *supra*, F039096.)

On July 12, 2019, petitioner, in propria persona, filed a petition for resentencing on his murder conviction pursuant to section 1172.6. In the petition, petitioner stated he

---

[9] Counts 3 through 6 were subsequently bifurcated in a separate jury trial. Therefore, for purposes of this appeal, only counts 1 and 2 are relevant.

[10] As to the out of custody enhancement (§ 12022.1), the trial court took judicial notice of case No. BF093169 with the complaint filed on October 13, 2000. The trial court subsequently found true the out of custody enhancement (§ 12022.1).

[11] At sentencing, the trial court struck the firearm enhancement (§ 12022.53, subd. (d)).

"was tried and convicted under a theory of natural and probable consequences or felony-murder and he was not found to [] be the principal.  Therefore, [his] conviction for [m]urder is improper under [Senate Bill No.] 1437 and should be vacated and [p]etitioner should be resentenced accordingly."  Petitioner further stated he "was tried for first-degree murder … [and] [t]he jury instructions included a 'natural and probable consequences' theory of aiding-abetting liability."  Petitioner further stated, "the jury agreed that the natural and probable consequences theory justified conviction for first degree murder in the absence of finding that [p]etitioner was guilty of felony-murder or provocative act murder" and that "there was no evidence to support allegations of premeditation in regards to committing murder."  Lastly, petitioner requested the appointment of counsel.

On August 6, 2019, the People filed a motion to dismiss the petition arguing Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) was unconstitutional.  On January 28, 2020, the People filed a further opposition to the petition arguing the jury's true finding on the robbery special circumstance established that petitioner was acting as a major participant in the felony with reckless indifference to human life and therefore was ineligible for relief.  On June 11, 2020, the People filed a supplemental opposition arguing petitioner was convicted of a provocative act murder and therefore fell outside the scope of section 1172.6.  On March 2, 2021, petitioner, through his counsel, filed a reply to the People's opposition to resentencing relief arguing that petitioner had made a prima facie showing of entitlement to resentencing relief.  On March 24, 2021, the trial court summarily denied the petition without providing a statement of reasons.

A timely appeal followed.  In a nonpublished opinion filed on June 10, 2022, we affirmed the trial court's denial of resentencing.  (*People v. Taylor* (June 10, 2022, F082567 [nonpub. opn.].)

On July 12, 2022, petitioner filed a petition for review arguing that the special circumstance finding made prior to *Banks* and *Clark* did not establish his ineligibility for

10.

section 1172.6 resentencing as a matter of law. On September 22, 2022, our Supreme Court granted his petition for review and transferred the matter back to this court with instructions to vacate our June 10, 2022 opinion and reconsider the matter in light of *Strong*. We vacated the prior opinion and issued an order stating it was the "intention of the court to reverse and remand this matter with directions [to the trial court] to issue an order to show cause," but provided either party 15 days to serve and file an objection. Since that order was filed, no objections were received.

We reverse the trial court's order denying the section 1172.6 petition and remand the matter for further proceedings.

## DISCUSSION

### I.    Applicable Law

Effective January 1, 2019, the Legislature passed Senate Bill 1437 "to amend the felony murder rule and the natural and probable consequences doctrine … to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

Senate Bill 1437 also added former section 1170.95, now renumbered as section 1172.6, to provide a procedure for those convicted of a qualifying offense "to seek relief under the two ameliorative provisions above." (*People v. Gentile* (20202) 10 Cal.5th 830, 843 (*Gentile*).) This procedure is available to persons convicted of "felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter." (§ 1172.6, subd. (a).)

"Section [1172.6] lays out a process" for a person convicted of one of the aforementioned offenses "to seek vacatur of his or her conviction and resentencing."

11.

(*Gentile*, *supra*, 10 Cal.5th at p. 853.)  First, an offender must file a petition in the sentencing court averring that:

> "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine[;]

> "(2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder[; and]

> "(3) The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019."  (§ 1172.6, subd. (a)(1)–(3); see also § 1172.6, subd. (b)(1)(A); accord, *People v. Lewis* (2021) 11 Cal.5th 952, 959–960 (*Lewis*).)

Additionally, the petition shall state "[w]hether the petitioner requests the appointment of counsel."  (§ 1172.6, subd. (b)(1)(C).)

If a petition fails to contain the required information and the information cannot be "readily ascertained" by the court, the petition may be denied without prejudice to the filing of another petition.  (§ 1172.6, subd. (b)(2).)  Otherwise, counsel must be appointed, if requested.  (§ 1172.6, subd. (b)(3).)  The prosecutor must file a response and the petitioner may file a reply.  The trial court must then hold a hearing to determine if the petitioner has made a prima facie showing that he or she is entitled to relief.  (§ 1172.6, subd. (c); accord, *Lewis*, *supra*, 11 Cal.5th at pp. 961–963, 967.)  In making this determination, the court may rely on the record of conviction, which includes, but is not limited to, jury instructions and verdict forms.  (*Lewis*, at pp. 970–971, 972.)  However, the prima facie inquiry is limited and, at this stage of the proceedings, the court "should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' "  (*Id*. at pp. 971–972.)  "If the court declines to make an order to show cause,

it shall provide a statement fully setting forth its reasons for doing so." (§ 1172.6, subd. (c).)

On the other hand, if the court determines the petitioner has met his or her prima facie burden, "the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder[, attempted murder, or manslaughter] conviction and to resentence the petitioner on any remaining counts." (*Gentile*, *supra*, 10 Cal.5th at p. 853; accord, § 1172.6, subds. (c), (d)(1).) At the hearing, the prosecution must "prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3).) The prosecutor and the petitioner may offer new or additional evidence to meet their respective burdens. The admission of evidence at the hearing is governed by the Evidence Code. However, the court also "may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed," as well as the "procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3).) Hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of section 872 is inadmissible at the evidentiary hearing, unless made admissible by another exception to the hearsay rule. (§ 1172.6, subd. (d)(3).)

## II. Analysis

Petitioner contends the jury's special circumstance finding cannot establish his ineligibility for resentencing as a matter of law because his conviction predates our Supreme Court's decisions in *Banks*/*Clark*, which clarified the meaning of "major participant" and "reckless indifference to human life." Based on our Supreme Court's holding in *Strong*, we agree.

Prior to *Strong*, the Courts of Appeal were split on the question of whether a special circumstance finding entered prior to *Banks* and *Clark* renders a petitioner ineligible for section 1172.6 resentencing relief as a matter of law. Our Supreme Court recently resolved this split and made clear that when, as here, a petitioner's case "was

13.

tried before both *Banks* and *Clark*, the special circumstance findings do not preclude him from making out a prima facie case for resentencing under section 1172.6." (*Strong*, *supra*, 13 Cal.5th at p. 721.) "This is true even if the trial evidence would have been sufficient to support the findings under *Banks* and *Clark*." (*Id*. at p. 710.) The *Strong* court noted the *Banks* and *Clark* cases "both substantially clarified the law governing findings under … section 190.2, subdivision (d)." (*Id*. at p. 706.) Further, the court articulated a pre-*Banks* and *Clark* special circumstance finding does not negate the showing a petitioner could not presently be convicted of murder or attempted murder because of changes to section 188 or 189 "because the finding alone does not establish that the petitioner is in a class of defendants who would still be viewed as liable for murder under the current understanding of the major participant and reckless indifference requirements." (*Id*. at p. 718.)

Here, the jury found true the section 190.2, subdivision (a)(17)(A) special circumstance approximately 15 years before *Banks* and *Clark* were decided. Pursuant to *Strong*, this finding does not preclude petitioner from stating a prima facie case for relief. (*Strong*, *supra*, 13 Cal.5th at p. 721.)

Accordingly, petitioner's section 1172.6 petition was facially sufficient and alleged the essential facts necessary for relief under section 1172.6. Nothing in the record indicates petitioner is ineligible for relief as a matter of law, and thus, we remand the matter for the trial court to issue an order to show cause and, to the extent necessary, conduct an evidentiary hearing. (§ 1172.6, subds. (c), (d)(1) & (3).) We express no opinion on the ultimate resolution of the petition.

## DISPOSITION

The trial court's order denying petitioner's section 1172.6 petition is reversed. On remand, the trial court is directed to issue an order to show cause and, to the extent necessary, hold an evidentiary hearing pursuant to section 1172.6, subdivision (d).

14.